# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

TIMOTHY J. HARRIS, on behalf of himself and derivatively on behalf of Harris FRC Corporation and The Mary Ellen Harris 2011 Grantor Retained Annuity Trust,

          Petitioner/Plaintiff,

and

KRISTEN HARRIS and MEGAN LOEWENBERG, on behalf of themselves and derivatively on behalf of Harris FRC Corporation and The Mary Ellen Harris 2011 Grantor Retained Annuity Trust,

          Plaintiffs,

    v.

MARY ELLEN HARRIS, JUDITH LOLLI, CHARLES GRINNELL, ROYCE MANAGEMENT, INC., MICHAEL SCHWAGER and PAUL PETIGROW,

          Defendants,

and

HARRIS FRC CORPORATION, a New Jersey Corporation,

          Respondent,

and

C.A. No. 2019-0736-JTL

|                                                    | )   |
| -------------------------------------------------- | --- |
| HARRIS FRC CORPORATION, a New                      | )   |
| Jersey Corporation and THE MARY                    | )   |
| ELLEN HARRIS 2011 GRANTOR                          | )   |
| RETAINED ANNUITY TRUST,                            | )   |
|                                                    | )   |
| Nominal Defendants.                                | )   |

# OPINION

Date Submitted: November 9, 2022
Date Decided: January 12, 2023

Joel Friedlander, Christopher M. Foulds, David Hahn, FRIEDLANDER & GORRIS, P.A., Wilmington, Delaware; *Counsel for Petitioner/Plaintiff Timothy J. Harris.*

S. Michael Sirkin, R. Garrett Rice, ROSS ARONSTAM & MORITZ LLP, Wilmington Delaware; Gregory Lomax, LAULETTA BIRNBAUM, Sewell, New Jersey; Jill Guldin, FISHER BROYLES, LLP, Princeton, New Jersey; *Counsel for Kristen C. Harris and Megan Harris Loewenberg.*

David A. Jenkins, Julie M. O'Dell, SMITH, KATZENSTEIN & JENKINS LLP; Wilmington, Delaware; *Counsel for Mary Ellen Harris.*

Steven L. Caponi, Matthew B. Goeller, Megan E. O'Connor, K&L GATES LLP, Wilmington, Delaware; *Counsel for Mary Ellen Harris, Paul Petigrow, and Michael Schwager.*

Kurt M. Heyman, Patricia L. Enerio, Gillian L. Andrews, HEYMAN ENERIO GATTUSO & HIRZEL LLP, Wilmington, Delaware; *Counsel for Royce Management, Inc., Judith Lolli, and Charles Grinnell.*

John L. Reed, Ronald N. Brown, III, Peter H. Kyle, Kelly L. Freund, DLA PIPER LLP (US), Wilmington, Delaware; Neal J. Levitsky, E. Chaney Hall, FOX ROTHSCHILD LLP, Wilmington, Delaware; Emily A. Kaller, GREENBAUM, ROWE, SMITH & DAVIS LLP, Woodbridge, New Jersey; *Counsel for Harris FRC Corporation.*

William M. Kelleher, Phillip A. Giordano, Madeline Silverman, GORDON, FOURNARIS & MAMMARELLA, P.A., Wilmington, Delaware; *Counsel for The Mary Ellen Harris 2011 Grantor Retained Annuity Trust.*

**LASTER, V.C.**

Harris FRC Corporation ("Harris FRC" or the "Company") is a family-owned corporation. The plaintiffs are three of the five children of Dr. Robert M. Harris, Sr., and Mary Ellen Harris.[1] The plaintiffs allege that Mary Ellen and four of her close friends and advisors schemed to seize control of the Company in 2015 as Dr. Harris's health was failing. Mary Ellen and her advisors then engaged in a series of self-dealing transactions that tunneled millions of dollars out of the Company. They also used Company funds to perpetuate their control. In this action, the plaintiffs have asserted claims for breach of fiduciary duty and aiding and abetting breaches of fiduciary duty against Mary Ellen and the four advisors. They also challenge a transaction in which Mary Ellen withdrew 245 shares from a trust (the "Share Withdrawal") as violating the terms of the trust instrument, and they claim that the advisors tortiously interfered with the trust instrument by assisting Mary Ellen in effectuating the Share Withdrawal.

Paul Petigrow is one of the advisors. After Mary Ellen gained control of the Company, he accepted the positions of Vice President and General Counsel. In those roles, the Company paid him $600,000 for part-time, sporadic work. Meanwhile, he ran a full-time law practice out of the Company's offices, paying no rent and using Company

---

[1] My standard practice is to identify individuals by their last name without honorifics. When individuals share the same last name, my standard practice is to shift to first names. Using first names is confusing because Dr. Robert M. Harris has a son with the same name. This decision therefore refers to the father as "Dr. Harris." That reference is sadly confusing as well, because one of the plaintiffs is Dr. Timothy J. Harris. This decision refers to him as "Tim Harris." The English language lacks a fitting collective noun for adult children; "children" remains technically accurate but implies minor status. This decision refers to the five adult children collectively as the "Siblings."

personnel and other resources to support his firm. Petigrow took the lead on the legal work associated with Mary Ellen and the other advisors' schemes to preserve Mary Ellen's control and extract cash and other benefits from the Company.

Petigrow accepts that this court can exercise personal jurisdiction over him for purposes of a claim asserting that he breached his fiduciary duties as an officer. He nevertheless argues that this court cannot exercise personal jurisdiction over him for purposes of a claim for tortious interference with the trust instrument.

The plaintiffs contend that there are two bases for the assertion of personal jurisdiction over Petigrow. The first is ancillary jurisdiction. Under that source of jurisdiction, once a court has properly asserted personal jurisdiction over a defendant for one claim, the court can exercise jurisdiction over the defendant for other claims that have a sufficient factual relationship to the first claim. The breaches of fiduciary duty that Petigrow allegedly committed include a derivative claim for improperly expending Company resources to accomplish the Share Withdrawal. Delaware's Officer Consent Statute provides a basis for the exercise of personal jurisdiction over Petigrow for purposes of that claim. If that claim remained in the case, then the court could exercise personal jurisdiction over Petrigrow for the claim for tortious interference with the trust instrument, because the two claims arise out of the same nucleus of underlying fact.

In a recent decision, however, this court held that a stock-for-stock merger in 2019 between the Company and a New Jersey corporation (the "Outbound Merger") caused the plaintiffs to lose standing to assert their derivative claims as such. Dkt. 482 (the "Standing Decision"). The court held that the plaintiffs could challenge the Outbound Merger directly

2

because alleged disclosure violations and its evident failure to value the derivative claims. The court can exercise jurisdiction over Petigrow for purposes of the direct claim that he breached his fiduciary duties in connection with the Outbound Merger, but the factual underpinnings of the Outbound Merger are not sufficiently related to the claim for tortious interference with the trust agreement to support jurisdiction over the latter claim. To be sure, when litigating the challenge to the Outbound Merger, the parties will be able to conduct discovery into the derivative claims for which standing was extinguished, including the claim for improper use of Company resources in connection with the Share Withdrawal, but only for purposes of litigating a claim about the Outbound Merger. That claim arises out of the events leading to the Outbound Merger; it does not have a sufficient factual connection with the claim for tortious interference with the trust instrument to support the exercise of ancillary jurisdiction.

The plaintiffs fare better with their second basis for personal jurisdiction, which relies on Delaware's Long-Arm Statute. In connection with the Share Withdrawal, Petigrow participated in moving the situs of the trust to Delaware by replacing its existing trustee with a Delaware trustee. That was a Delaware-directed act that is sufficient to support service of process under the Long-Arm Statute for purposes of the claim for tortious interference with the trust instrument, and the resulting exercise of personal jurisdiction for purposes of that claim is consistent with traditional notions of due process.

Petigrow also argues that the complaint fails to state claims against him for (i) aiding and abetting breaches of fiduciary duty in connection with the Share Withdrawal and (ii) tortiously interfering with the trust instrument. In light of the Standing Decision, the first

3

theory is no longer in the case as a standalone claim, so his motion to dismiss that count is moot. The second theory states a claim on which relief can be granted. Petigrow's motion to dismiss that count is denied.

## I.   FACTUAL BACKGROUND

The facts are drawn from the plaintiffs' Verified Supplemental and Third Amended Complaint (the "Complaint") and the documents that it incorporates by reference.[2] At this procedural stage, the plaintiffs are entitled to have the court credit their allegations and draw all reasonable inferences in their favor.

### A.   The Company

Before May 2016, the Company was a New Jersey corporation. From May 2016 until May 2019, the Company was a Delaware corporation. Since May 2019, the Company has been a New Jersey corporation. It is and always has been a family-held entity. Currently, its only stockholders are Mary Ellen, the five Siblings, and various trusts created for their benefit. The plaintiffs in this action are three of the Siblings: Tim Harris, Kristen Harris, and Megan Harris Loewenberg. As discussed below, another Sibling previously sued Mary Ellen and the Company and reached a settlement.

Dr. Harris founded the Company after securing the patent rights for an epilepsy drug. He monetized the patent rights through a transaction with a global biopharmaceutical

---

[2] Citations in the form "Ex. __" refer to documents attached to the Affidavit of Christopher M. Foulds, which collects certain documents that are incorporated by reference in the Complaint. Dkt. 467.

company and formed the Company to receive the royalty payments. That revenue stream historically amounted to approximately $100 million per year. The Company's only significant function was to collect and distribute the payments. In 2020, the Company sold its patent rights for $342 million in cash. The Company currently holds a pool of cash of around $120 million. It has no operating business.

The Company has issued 1,000 shares. Originally, Dr. Harris and Mary Ellen owned all of the shares jointly as tenants by the entireties. In 2002, they transferred 38 shares to each of the Siblings, resulting in each owning a 3.8% interest. In 2011, Dr. Harris and Mary Ellen each created a grantor retained annuity trust (a "GRAT") and funded each GRAT with 245 shares. The GRATs had terms of seven years and would expire on December 31, 2018. At that point, the shares would be distributed to the Siblings. Through the combination of the 190 shares they received directly and the 490 shares distributed from the GRATs, the Siblings would receive a total of 680 shares, representing a controlling 68% interest in the Company.

## B.     Dr. Harris's Illness

In October 2013, Dr. Harris was diagnosed with an aggressive form of aphasia consistent with Alzheimer's disease. After an MRI, two distinguished specialists at Columbia University confirmed the diagnosis.

As Dr. Harris's health deteriorated, Judith Lolli insinuated herself into Mary Ellen's financial life. Lolli and Mary Ellen are next-door neighbors in Holmdel, New Jersey. They also own adjacent beach houses in Point Pleasant, New Jersey. They are so close that Lolli

appears to have spliced Mary Ellen's cable connection and run a cable to her own home. Phone logs show that Mary Ellen and Lolli text many times a day.

Lolli brought Mary Ellen into contact with her own friends and advisors. Petigrow is a New Jersey lawyer who served as Lolli's personal counsel. Petigrow promptly became Mary Ellen's personal counsel as well.

Charles Grinnell is a New Jersey lawyer and career prosecutor who investigated and prosecuted the gangland murder of Lolli's brother, then became her close friend. Michael Schwager is Lolli's personal accountant and another close friend. Like the Complaint, this decision refers to Lolli, Petigrow, Grinnell, and Schwager collectively as the "Advisors."[3]

## C.    The Takeover

With Dr. Harris's health declining, questions arose as to who would lead the Company. Mary Ellen had no experience or qualifications for the role. The eldest Sibling, Robert M. Harris, Jr., had worked at the Company since 2000, held the office of Vice President, and managed the relationship that generated the Company's royalty stream.

---

[3] The defendants object to this term as an example of improper group pleading, but that objection is not well taken. The term "Advisors" is sufficiently limited to make the allegations plain, and the plaintiffs properly use the term to refer to actions that they believe the Advisors took collectively. They include specific allegations against individual advisors when they intend to call out particular individuals. That is not improper. *See, e.g.*, *In re Pattern Energy Gp., Inc. S'holders Litig.*, 2021 WL 1812674, at *58 n.737 (Del. Ch. May 6, 2021) (finding that complaint "pled specific facts against Garland and Browne" included allegations about "the Special Committee," which was defined to include them); *see also In re WeWork Litig.*, 2020 WL 7343021, at *11 (Del. Ch. Dec. 14, 2020) ("Although group pleading is generally disfavored, the Complaint's use of the term 'SoftBank' to capture both SBG and Vision Fund was justified here given the close relationship between these entities plead in the Complaint.").

A power struggle ensued with Mary Ellen and the Advisors on the one side and Robert on the other. In April 2015, eighteen months after his Alzheimer's diagnosis, Dr. Harris purportedly acted by written consent to remove Robert from his position as an officer. The written consent added Mary Ellen to the board of directors (the "Board"), where Dr. Harris had been the sole director. The plaintiffs assert that Dr. Harris did not have the capacity to execute the written consent and that Lolli pulled the strings so that Mary Ellen gained control over the Company.

Immediately after the first consent, Dr. Harris and Mary Ellen executed a second consent that caused the Company to enter into "an agreement with Lolli in substantially the form submitted hereto." Compl. ¶ 32. The consent did not attach an agreement. In June 2015, Lolli and Mary Ellen executed an employment agreement which provided for Lolli's compensation to be determined at an unspecified future date. Petigrow drafted the agreement. The Company began paying Lolli $15,000 annually as an employee and providing her with benefits.

The Company retained Grinnell as a consultant at a rate of $110 per hour. Schwager took over as the Company's accountant. Petigrow began doing more legal work for the Company. The Advisors had gotten their noses inside the tent.

In late summer 2015, Lolli and Grinnell formed Royce Management, Inc. ("Royce") as a vehicle for providing management services to the Company. In October, the Company began paying Royce $208,000 a month or $2,496,000 per year. The Company and Royce subsequently entered into a management services agreement that paid Royce $208,334 per month, provided for an annual fee escalator of 3.5%, and renewed automatically every

year. The Company and Royce have amended the management services agreement twice, each time making it more favorable to Royce. In addition to the monthly fee, Mary Ellen has approved large end-of-year bonuses for Royce. In total, Royce received over $20 million from the Company between October 2015 and December 2020.

Royce is a shell. It has no employees other than Lolli and Grinnell, and it has no other clients. It has no assets other than its contract with the Company. It operates out of the Company's offices. It exists solely to channel money to Lolli and Grinnell. It has no expenses other than their salaries, pension contributions, distributions, and two $1,000 per month luxury car leases.

**D.    Dr. Harris's GRAT**

To maintain control over the Company, Mary Ellen and the Advisors had to deal with the GRATs. If the GRATs distributed 480 shares to the Siblings as planned, then control over the Company would pass to them.

Around the same time that the Company began paying Royce, Lolli served as a witness when Dr. Harris purportedly amended his GRAT and executed a codicil to his will. Petigrow oversaw the drafting of the documents. The principal consequence of the amendments was to redirect the 290 shares in Dr. Harris's GRAT from the Siblings to Dr. Harris's marital trust. That trust benefits Mary Ellen, and she has a power of appointment over its corpus, enabling her to determine where the assets go when the GRAT terminates. The transaction reduced the number of Shares that the Siblings would receive from 680 to 435, below majority control.

8

The Advisors wanted a cooperative trustee to oversee Dr. Harris's GRAT and the marital trust, so Lolli and Grinnell turned to Dan Selcow, a wealth manager at First Republic Bank who was also a friend of Petigrow and Schwager. Initially, they brought some of the Harris' personal accounts to Selcow to manage. Eager for more business, Selcow arranged for First Republic Trust Company of Delaware LLC ("First Republic Delaware") to take over as trustee.

Mary Ellen and the Advisors also took control of the family's charity, the Golden Dome Foundation. Mary Ellen removed the Siblings from the board of the foundation and installed Petigrow, Grinnell, and Schwager. Mary Ellen viewed the Foundation as a place to stash money for her future use, explaining that she could "put money in golden dome and i [sic] pay no taxes and if I ever need it I can take a salary." *Id.* ¶ 51.

## E.    The Idea For The Inbound Merger

It was readily apparent that Robert might bring litigation over his removal and the events at the Company. New Jersey recognizes a claim for minority stockholder oppression, and available remedies include orders dissolving the corporation or appointing a custodian or provisional directors. A stockholder oppression lawsuit thus threatened to deprive Mary Ellen and the Advisors of control.

Mary Ellen and the Advisors believed that Delaware law would be more protective of their activities, so they started working on a merger that would move the Company to Delaware (the "Inbound Merger"). As Mary Ellen colorfully put it, "I have to work out a billion things at the office to get things ready for Delaware. They have better laws regarding shit like bob is pulling and we have connections there." Ex. 1.

9

In November 2015, Petigrow drafted Dr. Harris's letter of resignation from the Board, which he purportedly signed on November 16, two years after his Alzheimer's diagnosis. His resignation left Mary Ellen as the sole director. Petigrow drafted a power of attorney in which Dr. Harris empowered Mary Ellen to act on his behalf. Dr. Harris purportedly signed it, and Lolli witnessed it. Petigrow also drafted two proxies that Mary Ellen could use to vote Dr. Harris's shares, one for Dr. Harris to sign and one for Mary Ellen to sign using her power of attorney.

In December 2015, Mary Ellen provided an initial set of approvals for the Inbound Merger. She also appointed herself President and began paying herself $5 million per year for serving in that role. She continued the payments until 2019, when she resigned after the filing of this litigation. She appointed a lawyer to succeed her and paid him 11.5% of what she paid herself.

On December 7, 2015, Petigrow and Mary Ellen formed a Delaware corporation for use in the Inbound Merger. Two weeks later, Robert had his attorney send a letter to the Company that formally threatened litigation.

That same month, Petigrow wrote to the Siblings to explain why the Company was moving to Delaware. He claimed that the move would generate tax benefits and that the Inbound Merger "will have no effect on a shareholder who lives in New Jersey." Compl. ¶ 75. After that, Grinnell decided that the Company would not provide any more information to stockholders, using Robert's threat of a lawsuit as a pretext.

10

**F.      Value Extraction On A Larger Scale**

In 2016, Mary Ellen and the Advisors stepped up their extraction of value from the Company. That year also saw Robert follow through with his threat of litigation by filing an action in New Jersey state court.

In February 2016, Mary Ellen signed a written consent approving an employment agreement with Petigrow. It paid him $600,000 per year to serve as Vice President and General Counsel for the Company. Petigrow continued to run a solo law practice out of the Company's offices, using the Company's personnel and resources, and without paying rent. Given his full-time law practice, Petigrow worked only part-time and sporadically as General Counsel.

In March 2016, Lolli had a physician friend declare Dr. Harris incapacitated. Petigrow drafted the physician's certificate, which read: "I have concluded that by reason of progressive mental deterioration, he has, as of the date hereof, become incapacitated to act rationally and prudently in financial matters." Ex. 4. The doctor who signed has a longstanding relationship with Lolli and works at Bayshore Health Center, which later received a $10 million donation that was paid for by Company and which supported the creation of an emergency care center in Dr. Harris's name. Ex. 6.[4] Grinnell witnessed the certificate. Ex. 4.

---

[4] As discussed below, the Golden Dome Foundation made the pledge, but Mary Ellen and the Advisors caused the Company to pay it.

That same month, Mary Ellen adopted a resolution in her capacity as sole director that paid Dr. Harris a bonus in the amount of $15 million. Given Dr. Harris's incapacitation, the $15 million bonus was a disguised distribution to Mary Ellen.

Schwager cashed in too. Given the Company's minimal operations, the services for its accounting and taxes should have cost $20,000 to $30,000 per year. The Company entered into an arrangement with Schwager under which the Company paid him simultaneously on two parallel schedules: (i) $12,500 a month for a total of $150,000 per year, and (ii) $25,000 quarterly for another $100,000 per year. He also received annual "Merry Christmas" bonuses of $35,000. Schwager thus raked in $285,000 per year, ten times what the Company should have been paying. Plus, at the Company's expense, Schwager provided tax and accounting services to Mary Ellen, the Advisors, and their entities, including for Royce. Recognizing the depth of his involvement with the Company, Grinnell referred to Schwager as the Company's Chief Financial Officer.

On May 1, 2016, the Inbound Merger became effective, and the Company emerged as a Delaware corporation. Robert exercised dissenters' rights and pursued an appraisal proceeding in New Jersey state court.

Now firmly in control of the Company, and believing that they had protection under Delaware law, Mary Ellen and the Advisors used Company funds to pay for an array of personal expenses. Lolli, Petigrow, and Grinnell reviewed and approved the bills. Schwager paid them. On the Company's taxes, Schwager deducted the expenses as if they were business related.

In April 2017, Dr. Harris died. The shares in his GRAT that would have gone to the Siblings passed to the marital trust.

## G.    The Transactions To Preserve Control

During the second half of 2018, Mary Ellen and the Advisors engaged in two transactions designed to preserve their control over the Company. The first was a settlement with Robert, who was continuing to pursue his lawsuits. Mary Ellen and the Advisors understood that if Robert prevailed in his stockholder oppression action, then they could lose control. Just before Mary Ellen's deposition, she settled with Robert by having the Company pay him more than $20 million.

The second transaction was the Share Withdrawal. Mary Ellen's GRAT was still scheduled to expire on December 31, 2018, at which point 245 shares representing just under 25% of the Company's common stock would be distributed to the Siblings. Under the trust agreement governing the GRAT, Mary Ellen could withdraw assets if she provided the trust with "equivalent value." Compl. ¶ 95. The Advisors decided that Mary Ellen would withdraw the shares at a lowball price, thereby benefiting herself by preventing a block of shares from falling into potentially adverse hands while expropriating the difference between the lowball price and fair value.

To support a lowball price for the Share Withdrawal, Petigrow commissioned an appraisal of the Company from EisnerAmper LLP, a valuation firm. Schwager helped furnish the firm with information. EisnerAmper had performed valuation work for Mary Ellen on two prior occasions, including as an expert in Robert's lawsuit. Mary Ellen had one of the New Jersey lawyers currently serving as forwarding counsel for the Company

13

("Company Forwarding Counsel") sign the engagement letter, which specified that EisnerAmper was working for the lawyer. Yet the Company paid EisnerAmper's fee. The Company also paid Petigrow, Schwager, Grinnell, Lolli, and Company Forwarding Counsel for their work on the Share Withdrawal.

The appraisal valued the Company at $242,863,296. The plaintiffs have pointed to substantial flaws in the appraisal, including a facially questionable 20% company-specific risk premium that increased the discount rate from 13% to 33%. The 20% company-specific risk premium was based in large part on a pending application by generic pharmaceutical companies for certiorari to the Supreme Court of the United States. As of November 19, 2018, weeks before what should have been a December valuation date, the Supreme Court had denied certiorari. *See Accord Healthcare, Inc. v. UCB, Inc.*, 139 S. Ct. 574 (2018). After more questionable discounts, the report appraised the 245 shares at $52,677,000, or 21.7% of the value of the Company. The shares represented 24.5% of the Company's capitalization, so on that basis alone, Mary Ellen was paying 88.5% of their value (21.7% divided by 24.5%) for a built in 11.5% discount. The underpricing was much greater because the Company itself was undervalued. Backing out the 20% company-specific risk premium increases the value of the Company to $325 million. A 24.5% share of that value is $79,625,000. Mary Ellen's valuation was 66.1% of that figure, meaning that Mary Ellen was getting a 33.9% discount.

With a lowball valuation in hand, the next step was to find a trustee who would go along with the Share Withdrawal. And with the expiration date of the GRAT rapidly

14

approaching, Mary Ellen and the Advisors needed a trustee who would sign off quickly, before December 31, 2018.

The Advisors went back to First Republic Delaware, where Selcow had benefitted from managing more and more of Mary Ellen's assets. Selcow readily agreed and secured the greenlight internally to have First Republic Delaware become the trustee for Mary Ellen's GRAT. Selcow had a conflict of interest for purposes of the Share Withdrawal because his compensation depended on increasing assets under management for First Republic Delaware and generating referral fees. The Advisors indicated that after the Share Withdrawal, Mary Ellen would divide the GRAT into five successor trusts, one for each Sibling, which First Republic Delaware could manage. By signing off on the Share Withdrawal, Selcow and First Republic Delaware gained a new pool of $50 million to put in fee-generating assets. First Republic Delaware also had a conflict, because it loaned Mary Ellen the money for the Share Withdrawal. First Republic Delaware thus had a buy-side interest in the same transaction where First Republic Delaware was supposedly evaluating the deal as a fiduciary for the seller.

Grinnell and Lolli pushed Petigrow to complete the Share Withdrawal quickly. Schwager worked on the financial side. Petigrow coordinated the legal documentation.

First Republic Delaware officially became trustee of Mary Ellen's GRAT on December 24, 2018. Within two days after being appointed a trustee, First Republic Delaware had approved the Share Withdrawal at the valuation set by Mary Ellen's appraiser. First Republic Delaware did not negotiate. First Republic Delaware claimed that it "conducted such due diligence as it determined advisable and has determined that the

15

properties acquired and substituted by the Grantor are of equivalent value, and consents to the substitution of assets." Ex. 12 at 1.

In the same document in which it signed off on the Share Withdrawal, First Republic Delaware secured indemnification from Mary Ellen for any liability resulting from the Share Withdrawal. *Id.* at 2. The document also contains a joint defense agreement in which Mary Ellen committed to "defend First Republic with the counsel of [Mary Ellen's] choice," First Republic Delaware agreed not to enter into a settlement without Mary Ellen's consent, and the two parties agreed to cooperate in any litigation. *Id.* When it made and received those commitments, First Republic Delaware was nominally adverse to Mary Ellen on the Share Withdrawal and obligated to sue Mary Ellen to protect the GRAT if the trust did not obtain equivalent value for the shares.

With the Share Withdrawal complete, Grinnell thanked First Republic Delaware for a "great job." Compl. ¶ 108. First Republic Delaware wrote back that it was "a great team effort on our side and your side." *Id.* Grinnell wrote to Lolli: "CONGRATULATIONS!!!" *Id.*

Also in December 2018, the Golden Dome Foundation made two $5 million irrevocable pledges to Bayshore Medical Center, where the doctor worked who had declared Dr. Harris incompetent. One $5 million pledge had a seven-year term that contemplated equal payments of approximately $715,000. The Company began paying the roughly $715,000 installments. The second $5 million pledge had no installment payments. One year later, after this litigation was filed, the Company paid the second pledge.

16

## H.     Tim Harris Hires Counsel And Asks Questions.

The Siblings had heard rumblings about the Share Withdrawal. On February 14, 2019, Loewenberg wrote to the Advisors: "I spoke with my mother on Friday about the GRAT, and she said she has no idea what is going on with it and to call [Company Forwarding Counsel]. I spoke with [Company Forwarding Counsel], and she said she isn't involved with the GRAT." *Id.* ¶ 109. That representation was false. Company Forwarding Counsel had signed EisnerAmper's engagement letter. Over a month later, First Republic Delaware told Tim Harris that "Mary Ellen exercised her power to substitute the Harris FRC stock with cash." *Id.* ¶ 110. That same week, First Republic Delaware was in discussion with the Advisors about moving the "Mary Ellen and the Harris FRC relationship from Schwab to First Republic." *Id.* ¶ 111.

On April 10, 2019, Tim Harris's counsel in this action attended the annual meeting as his proxy. Petigrow and Grinnell attended for the Company. Mary Ellen did not attend. Petigrow chaired the meeting. Grinnell refused to identify himself. Petigrow called for a vote for the election of Mary Ellen as the Company's sole director and exercised proxies from Mary Ellen and First Republic Delaware in favor of her election. The proxies represented a majority of the Company's voting power. After tallying the vote, he called the meeting to a close.

Before the meeting was adjourned, Tim Harris's counsel asked for a report on the business of the Company, then followed up with a series of specific questions. Petigrow and Grinnell failed to provide substantive answers on numerous topics. Grinnell repeatedly asserted that all stockholder questions needed to be put in writing.

17

## I. The Outbound Merger

With Tim Harris having retained a Delaware lawyer whose questions had not been answered, the Advisors anticipated that a books-and-records demand would be coming. Immediately after the annual meeting, Mary Ellen and the Advisors started working on a plan for the Outbound Merger, which would take the Company out of Delaware and back into New Jersey. Grinnell circulated a New Jersey Supreme Court decision which indicated that inspection rights could be limited to formal documents like financial statements, minutes, and a list of stockholders. The Company did not keep meetings, and Schwager prepared the Company's financial statements so that they did not reveal the many self-interested transactions or the payments to Royce. The Advisors also thought that the Outbound Merger would cut off the Siblings' standing to assert derivative claims regarding events predating the merger.

On May 6, 2019, Tim Harris sent the Company a written demand for documents under Section 220. On May 13, the Company refused to produce any documents, claiming the demand constituted "harassment." *Id.* ¶ 127.

The Outbound Merger became effective on May 17, 2019. Mary Ellen approved the Outbound Merger as a director, and Mary Ellen and First Republic Delaware executed written consents approving it as stockholders.

Mary Ellen signed the merger agreement and the certificate of merger. Petigrow caused the certificate of merger to be filed with the Delaware Secretary of State. Schwager assisted in preparing the merger documentation.

18

The notice provided scant information about the Outbound Merger. It offered only the following justification:

> The Delaware Reincorporation was effected with the intent of capturing certain efficiencies that were deemed at the time to be in the best interest of the predecessor company and its stockholders. The board of directors of Harris Delaware has determined that the circumstances giving rise to such potential efficiencies are no longer present. . . . Harris Delaware's board of directors has determined that it is advisable for Harris Delaware's internal affairs to be governed by New Jersey law.

*Id.* ¶ 131. The notice did not include any information about the large payments going to Royce and to Schwager, the plentitude of personal expenses being paid for by the Company, or the numerous entities being run out of the Company's offices.

## J. This Litigation

The Outbound Merger stymied Tim Harris's attempt to use Section 220, but it opened up another informational avenue. Tim Harris sought appraisal for one share of Company common stock. In discovery, he sought the information that a books-and-records inspection would have generated.

Within weeks after Tim Harris petitioned for appraisal, Grinnell and Petigrow amended Petigrow's employment agreement. The amendment extended the term of the contract through December 31, 2022, allowed Petigrow to terminate the agreement for good reason, and provided for a change of control payment triggered by a sale of assets. Within a week after executing that document, the Company began a process to sell its patent rights—the Company's only asset.

19

**K. The Sale Of Assets**

In July 2020, the Company agreed to sell its royalty stream for $342 million in cash. That amount was $100 million more than the valuation of $242,863,296 that EisnerAmper placed on the Company for purposes of the Share Withdrawal. The amount is quite close to the figure of $325 million that results from backing out the facially implausible 20% company-specific risk premium that boosted the discount rate to 33%. Internally, First Republic Delaware noted the gulf between the two prices. First Republic Delaware then promptly signed off on the sale, without asking any questions.

**L. The Currently Operative Complaint**

In September 2021, Tim Harris filed an amended petition and complaint that added plenary claims for breach of fiduciary duty against Mary Ellen and claims for breach of fiduciary duty and aiding and abetting against the Advisors. In October, Kristen and Loewenberg joined the case as additional plaintiffs. In March 2022, the plaintiffs filed the Complaint.

Count I of the Complaint asserts that Mary Ellen has breached her fiduciary duties as President, sole director, and controlling stockholder of the Company. The Complaint groups the breaches into six broad categories:

- approving self-interested and unfair compensation and other personal payments to herself;

- using Company resources for personal gain, including by supporting her personal ventures and engaging in transactions to maintain her control;

- colluding with the Advisors by providing them with exorbitant compensation and benefits to pay them off for helping her engage in and cover up wrongdoing at the Company;

- sequestering distributions to oppress stockholders;

- engaging in the Outbound Merger; and

- verifying knowingly incomplete and misleading discovery responses.

This court issued a decision holding that the only theory currently at issue in Count I is the direct challenge to the Outbound Merger. *See* Standing Decision, 2023 WL 115541 (Del. Ch. Jan. 6, 2023).

Skipping for the moment over Count II, Count III asserts claims for breach of fiduciary duty against the Advisors in their capacity as officers and agents. The Complaint alleges that Petigrow is a *de jure* officer, having agreed to serve as General Counsel. The Complaint alleges that Grinnell, Lolli, and Schwager acted as *de facto* officers. The Complaint alleges in the alternative that all were senior managers and agents of the Company who owed fiduciary duties in those capacities. The substance of the claims for breach of fiduciary duty against the Advisors generally tracks the claims against Mary Ellen. The Standing Decision applies to this count, so the only theory currently at issue is a direct challenge to the Outbound Merger.

Count IV alleges in the alternative that to the extent the Advisors are not accountable for breaching their own duties as fiduciaries of the Company, both they and Royce have aided and abetted the breaches of fiduciary duty by Mary Ellen, Petigrow, and any other Advisor that is found to have owed fiduciary duties. The Standing Decision applies to this count as well, so the only theory currently at issue is a direct challenge to the Outbound Merger.

21

The other two counts address the Share Withdrawal. Count II of the Complaint asserts that Mary Ellen breached the trust instrument governing her GRAT by failing to pay reasonably equivalent value in the Share Withdrawal. Count V asserts that Lolli, Grinnell, Petigrow, Schwager, and Royce tortiously interfered with the trust instrument by assisting Mary Ellen with the Share Withdrawal.

The defendants moved for dismissal on a multitude of grounds. This decision addresses Petigrow's contention that this court cannot exercise personal jurisdiction over him for purposes of Count V. It also addresses Petigrow's contentions that Counts IV and V do not state claims against him.

## II. THE RULE 12(B)(2) MOTION

Petigrow maintains that that this court cannot exercise personal jurisdiction over him for purposes of Count V. "Generally, a plaintiff does not have the burden to plead in its complaint facts establishing a court's personal jurisdiction over defendant." *Benerofe v. Cha*, 1996 WL 535405, at *3 (Del. Ch. Sept. 12, 1996). However, "[w]hen a defendant moves to dismiss a complaint pursuant to Court of Chancery Rule 12(b)(2), the plaintiff bears the burden of showing a basis for the court's exercise of jurisdiction over the defendant." *Ryan v. Gifford*, 935 A.2d 258, 265 (Del. Ch. 2007).

The plaintiffs' burden in responding to a Rule 12(b)(2) motion is an evidentiary burden, not a pleading burden. *Hart Hldg. Co. Inc. v. Drexel Burnham Lambert Inc.*, 593 A.2d 535, 538 (Del. Ch. 1991) (Allen, C.). A verified complaint satisfies the requirements for an affidavit and provides an evidentiary basis on which the plaintiff can rely. *See Bruce E. M. v. Dorothea A. M.*, 455 A.2d 866, 869 (Del. 1983) ("A verified pleading may also be

22

used as an affidavit if the facts stated therein are true to the party's own knowledge.");

*accord Weber v. Kirchner*, 2003 WL 23190392, at *3 (Del. Ch. Dec. 31, 2003); *Taylor v. Jones*, 2002 WL 31926612, at *2 n.6 (Del. Ch. Dec. 17, 2002).

When considering a Rule 12(b)(2) motion, the court is not limited to the allegations of the complaint and can consider evidentiary submissions provided by the parties.[5] If the court has not conducted an evidentiary hearing, then a plaintiff "need only make a *prima facie* showing, in the allegations of the complaint, of personal jurisdiction and the record is construed in the light most favorable to the plaintiff."[6] If the court takes that approach, then the jurisdictional question technically remains open until trial, when the plaintiff must prove the jurisdictional facts by a preponderance of the evidence.[7]

---

[5] *Sample v. Morgan (Sample II)*, 935 A.2d 1046, 1055–56 (Del. Ch. 2007) ("In considering a motion to dismiss for lack of personal jurisdiction under Court of Chancery Rule 12(b)(2), I am not limited to the pleadings. Rather, I am 'permitted to rely upon the pleadings, proxy statement, affidavits, and briefs of the parties in order to determine whether the defendants are subject to personal jurisdiction.'" (quoting *Crescent/Mach I P'rs, L.P. v. Turner*, 846 A.2d 963, 974 (Del. Ch. 2000)); *Ryan*, 935 A.2d at 265 ("In ruling on a Rule 12(b)(2) motion, the court may consider the pleadings, affidavits, and any discovery of record.").

[6] *Sprint Nextel Corp. v. iPCS, Inc.*, 2008 WL 2737409, at *5 (Del. Ch. July 14, 2008); *Sample II*, 935 A.2d at 1056 ("In evaluating the record [on a Rule 12(b)(2) motion], I must draw reasonable inferences in favor of the plaintiff."); *Ryan*, 935 A.2d at 265 ("If . . . no evidentiary hearing has been held, plaintiffs need only make a prima facie showing of personal jurisdiction and the record is construed in the light most favorable to the plaintiff." (footnotes and quotation marks omitted)).

[7] *Travelers Indem. Co. v. Calvert Fire Ins. Co.*, 798 F.2d 826, 831 (5th Cir. 1986) ("However, 'at any time when the plaintiff avoids a preliminary motion to dismiss by making a prima facie showing of jurisdictional facts, he must still prove the jurisdictional facts at trial by a preponderance of the evidence,' or, as otherwise stated, '[e]ventually, of course, the plaintiff must establish jurisdiction by a preponderance of the evidence, either

The facts necessary to demonstrate the existence of personal jurisdiction are often in the exclusive control of the defendant. *See Compagnie Des Bauxites de Guinee v. L'Union Atlantique S.A. d'Assurances*, 723 F.2d 357, 362 (3d Cir. 1983); *Surpitski v. Hughes-Keenan Corp.*, 362 F.2d 254, 255–56 (1st Cir. 1966). "As a plaintiff does have an evidentiary burden, [it] may not be precluded from attempting to prove that a defendant is subject to the jurisdiction of the court, and may not ordinarily be precluded from reasonable discovery in aid of mounting such proof." *Hart*, 593 A.2d at 539. "Only where the facts alleged in the complaint make any claim of personal jurisdiction over defendant frivolous, might the trial court, in the exercise of its discretionary control over the discovery process, preclude reasonable discovery in aid of establishing personal jurisdiction." *Id.* As long as the plaintiff has provided "some indication" that the particular defendant is amenable to suit, then jurisdictional discovery is appropriate. *Hansen v. Neumueller GmbH*, 163 F.R.D. 471, 475 (D. Del. 1995); *see Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 n.13 (1977) ("[W]here issues arise as to jurisdiction or venue, discovery is available to ascertain the facts bearing on such issues.").

Under Delaware law, the exercise of personal jurisdiction has two requirements. *Matthew v. Fläkt Woods Gp. SA*, 56 A.3d 1023, 1027 (Del. 2012). First, the plaintiff must identify a valid method of serving process. Second, the exercise of personal jurisdiction

at a pretrial evidentiary hearing or at a trial.'" (quoting *Data Disc, Inc. v. Sys. Tech. Assocs., Inc.*, 557 F.2d 1280, 1285 n.2 (9th Cir. 1977) and *Marine Midland Bank, N.A. v. Miller*, 664 F.2d 899, 904 (2d Cir. 1981))).

must rest on sufficient minimum contacts between the defendant and Delaware such that the exercise of personal jurisdiction "does not offend traditional notions of fair play and substantial justice." *Id.* (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

## A. Service Of Process Under The Officer Consent Statute

Delaware's Officer Consent Statute provides for service of process on anyone who "accepts election or appointment as an officer of a corporation organized under the laws of this State, or who after such date serves in such capacity" for purposes of "all civil actions or proceedings brought in this State, by or on behalf of, or against such corporation, in which such officer is a necessary or proper party, or in any action or proceeding against such officer for violation of a duty in such capacity." 10 *Del. C.* § 3114(b). Petigrow recognizes that he is subject to jurisdiction under Section 3114(b) for purposes of the claims for breach of fiduciary duty asserted against him in Count III because he accepted appointment as Vice President and General Counsel of the Company, and Count III asserts that he breached his fiduciary duties in that capacity.

To exercise personal jurisdiction over Petigrow for purposes of Count V, the plaintiffs rely on the concept of ancillary jurisdiction. "[O]nce a valid claim has been brought and personal jurisdiction established over a party defending a proper claim, . . . Delaware courts are justified in asserting personal jurisdiction over the defending party where the subject matter of the claim is sufficiently related to the plaintiff's independent

25

claims."[8] This court has explained that when "many of the same acts and factual circumstances" form the bases for both the claim over which the court can exercise personal jurisdiction and for the claim where personal jurisdiction is contested, then the claims are sufficiently "interwoven" to warrant exercising personal jurisdiction over the defendant for purposes of the latter claim. *Fitzgerald*, 1999 WL 1022065, at *5. "Delaware public policy favors Delaware courts assuming personal jurisdiction over parties in order to adjudicate claims which sufficiently relate to other claims which do properly bring the party within those courts' jurisdiction." *Id.* at *4; *accord SPay*, 2021 WL 6053869, at *5. Doing so serves policy interests in "achiev[ing] judicial economy and avoid[ing] duplicative efforts among courts in resolving disputes." *Fitzgerald*, 1999 WL 1022065, at *4.

Under these principles, "Delaware courts have asserted personal jurisdiction over corporate director defendants for non-fiduciary type claims that are merely factually related to other claims alleging breaches of fiduciary duties." *Id.* For example, once directors were subject to personal jurisdiction under Section 3114(a) for purposes of a claim for breach of fiduciary duty, this court exercised ancillary jurisdiction over them for purposes of a debt claim arising out of the same underlying facts. *See Technicorp Int'l II, Inc. v. Johnston*, 1997 WL 538671, at *20 (Del. Ch. Aug. 25, 1997). Similarly, once directors were subject

---

[8] *Fitzgerald v. Chandler*, 1999 WL 1022065, at *4 (Del. Ch. Oct. 14, 1999) (citation and internal punctuation omitted); *see also SPay, Inc. v. Stack Media Inc.*, 2021 WL 6053869, at *4–5 (Del. Ch. Dec. 21, 2021) (exercising jurisdiction because "claims are sufficiently related for personal jurisdiction purposes"); *Canadian Com. Workers Indus. Pension Plan v. Alden*, 2006 WL 456786, at *11–12 (Del. Ch. Feb. 22, 2006) (exercising jurisdiction where claims "depend on a number of the same facts").

to personal jurisdiction under Section 3114(a) for purposes of a claim for breach of fiduciary duty, this court exercised ancillary jurisdiction over them for purposes of a claim that they wrongfully terminated the plaintiff's employment and tortiously interfered with the employment agreement. *Manchester v. Narragansett Cap., Inc.*, 1989 WL 125190, at *7 (Del. Ch. Oct. 19, 1989). Other cases likewise assert jurisdiction over defendants who are present under Section 3114 for purposes of related claims. *See Baldwin v. Russell*, 1990 WL 13484, at *1 (Del. Ch. Feb. 7, 1990); *Gans v. MDR Liquidating Corp.*, 1990 WL 2851, at *10 (Del. Ch. Jan. 10, 1990); *Brinati v. TeleSTAR, Inc.*, 1985 WL 44688, at *2 (Del. Ch. Sept. 3, 1985).

Count III asserts both derivative and direct claims against Petigrow for breaching his fiduciary duties as an officer. The Delaware Supreme Court has held "officers of Delaware corporations, like directors, owe fiduciary duties of care and loyalty." *Gantler v. Stephens*, 965 A.2d 695, 708–09 (Del. 2009). The officer's duty of loyalty has additional dimensions because officers also act as agents for the entity.[9] Agents are fiduciaries.[10]

---

[9] *See Lebanon Cnty. Empls.' Ret. Fund v. AmerisourceBergen Corp.*, 2020 WL 132752, at *21 (Del. Ch. Jan. 13, 2020) ("Officers also are fiduciaries in their capacities as agents who report to the board of directors."), *aff'd*, 243 A.3d 417 (Del. 2020).

[10] Restatement (Third) of Agency § 1.01 (Am. L. Inst. 2006), Westlaw, (database updated Oct. 2022) [hereinafter Restatement of Agency] (defining agency as "the fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act"); *id.* § 8.01 ("An agent has a fiduciary duty to act loyally for the principal's benefit in all matters connected with the agency relationship."); *see Sci. Accessories Corp. v. Summagraphics Corp.*, 425 A.2d 957, 962 (Del. 1980) ("It is true, of course, that under elemental principles of agency law, an agent owes his principal a duty of good faith, loyalty and fair dealing."); Ramon

27

Under a particularly well-developed body of fiduciary law, agents owe additional and more concrete duties to their principal. *See generally* Restatement of Agency, *supra*, §§ 8.02–.12.

## 1. The Relationship Between The Derivative Aspect Of Count III And Count V

In Count III, the Complaint asserts that Petigrow breached his duties by (i) pursuing the personal best interests of Mary Ellen and the Advisors rather than the best interests of the Company and all of its stockholders and (ii) pursuing his own best interests rather than the best interests of the Company. Like directors, officers must "place the interests of the corporation and shareholders that they serve before their own." *TVI Corp. v. Gallagher*, 2013 WL 5809271, at *11 (Del. Ch. Oct. 28, 2013). And like directors, officers have a duty to act "loyally by trying to do their job for proper corporate purposes in good faith," rather than disloyally by in bad faith putting other interests, such as the self-interest of a superior, ahead of the corporation's best interest. *Hampshire Gp., Ltd. v. Kuttner*, 2010 WL 2739995, at *12 (Del. Ch. July 12, 2010). As an agent, an officer has a duty "not to use

Casadesus-Masanell & Daniel F. Spulber, *Trust and Incentives in Agency*, 15 S. Cal. Interdisc. L.J. 45, 68 (2005) ("While all agents are fiduciaries, not all fiduciaries are agents."); Thomas Earl Geu, *A Selective Overview of Agency, Good Faith and Delaware Entity Law*, 10 Del. L. Rev. 17, 20 (2008) (explaining that fiduciary status is "a result of agency" and collecting authorities establishing the point); Barak Orbach, *D&O Liability for Antitrust Violations*, 59 Santa Clara L. Rev. 527, 560 n.2 (2020) ("All agents are fiduciaries but not all fiduciaries are agents."). There are Delaware cases which assert errantly that an agency relationship, standing alone, does not give rise to fiduciary duties on the part of the agent. For a discussion of those cases, see *Metro Storage Int'l LLC v. Harron*, 275 A.3d 810, 843 n.14 (Del. Ch. 2022).

property of the principal for the agent's own purposes or those of a third party." Restatement of Agency, *supra*, § 8.05(1).

> This rule is a specific application of an agent's basic fiduciary duty . . . . The rule is also a corollary of a principal's right, as an owner of property, to exclude usage by others. An agent is subject to this duty whether or not the agent uses property of the principal to compete with the principal or causes harm to the principal through the use. An agent may breach this duty even when the agent's use is beneficial in some sense to the property or to the principal. An agent is subject to liability to the principal for any profit made by the agent while using the principal's property when the use facilitates making the profit, or otherwise for the value of the use.

*Id.* cmt. b. An agent also "has a duty . . . not to use or communicate confidential information of the principal for the agent's own purposes or those of a third party." *Id.* § 8.05.

In this case, the principal is the Company, not Mary Ellen. The Complaint alleges that Petigrow breached his duties by engaging in an extensive list of acts that included (i) securing the lowball valuation from EisnerAmper, (ii) overseeing the preparation of the documents for the Share Withdrawal, and (iii) causing the Company to pay for the appraisal used to justify the Share Withdrawal and for the legal documentation for the Share Withdrawal. Those acts benefited Mary Ellen, rather than benefitting the Company. They indirectly benefitted Petigrow, rather than the Company, by keeping him in Mary Ellen's good graces.

The factual underpinnings for these aspects of Count III overlap significantly with the factual underpinnings for the claim for tortious interference with the trust instrument in Count V. The two claims arise out of a common nucleus of operative fact. If these aspects of Count III remained in the case, then the court could exercise ancillary jurisdiction over Petigrow for purposes of Count V.

29

In the Standing Decision, however, this court held that the plaintiffs had lost standing to pursue derivative claims that arose prior to the Outbound Merger as derivative claims. The aspects of Count III that could support ancillary jurisdiction over Petigrow are no longer in the case and cannot provide the plaintiffs with their jurisdictional hook.

## 2. The Relationship Between The Direct Aspect Of Count III And Count V

In Count III, the plaintiffs also assert a direct claim against Petigrow for breaching his fiduciary duties in connection with the Outbound Merger. When a transaction will trigger appraisal rights, corporate fiduciaries must provide stockholders with material information necessary to make an informed decision to either accept the merger consideration or seek appraisal. *Turner v. Bernstein*, 776 A.2d 530, 536 (Del. Ch. 2000); *Nagy v. Bistricer*, 770 A.2d 43, 59 (Del. Ch. 2000). That duty applies with equal force to a merger involving a privately held company. *E.g.*, *Nagy*, 770 A.2d at 47 ("Defendant Riblet Products Corporation is a closely-held corporation . . . .").

The duty of disclosure applies not only to directors but to officers as well.[11] A plaintiff can state a claim against an officer for breach of the duty of disclosure when the officer participates in the drafting of or signs off on a disclosure document that omits material information.[12]

---

[11] *See Lentz v. Mathias*, 2022 WL 2719504, at *17 (Del. Ch. July 13, 2022); *see Harcum v. Lovoi*, 2022 WL 29695, at *27 (Del. Ch. Jan. 3, 2022). *In re Columbia Pipeline Gp., Inc.*, 2021 WL 772562, at *56 (Del. Ch. Mar. 1, 2021).

[12] *See Goldstein v. Denner*, 2022 WL 1671006, at *56 (Del. Ch. May 26, 2022); *Pattern Energy*, 2021 WL 1812674, at *70; *Columbia Pipeline*, 2021 WL 772562, at *57; *Firefighters' Pension Sys. of City of Kansas City, Missouri Tr. v. Presidio, Inc.*, 251 A.3d

Stockholders are "entitled to know that certain of their fiduciaries have a self-interest that is arguably in conflict with their own," and "are entitled to receive material information bearing on conflicts of interest in a clear and transparent manner." *Goldstein*, 2022 WL 1671006, at \*23–24 (cleaned up). In a quasi-appraisal proceeding, plaintiffs are entitled "to the quantum of money equivalent to what a stockholder would have received in an appraisal, namely the fair value of the stockholder's proportionate share of the equity of the corporation as a going concern." *In re Orchard Enters., Inc. S'holder Litig.*, 88 A.3d 1, 42 (Del. Ch. 2014).

The Outbound Merger triggered appraisal rights. The defendants did not disclose that they believed the Outbound Merger would extinguish the stockholders' standing to assert derivative claims. The defendants did not disclose the amounts that the Company was paying Mary Ellen, Petrigrow, Royce, Lolli, Grinnell, or Schwager. The financial statements did not disclose any of the payments to Royce, which seem to have been hidden in the category of legal expenses. The defendants provided a bare-bones, minimalist disclosure.

These factual allegations make it reasonably conceivable that the plaintiffs "were denied the information necessary to make an informed decision whether to seek appraisal." *In re Rural Metro Corp. S'holders Litig.*, 88 A.3d 54, 107 (Del. Ch. 2014). The allegations

---

212, 288 (Del. Ch. 2021); *City of Warren Gen. Empls.' Ret. Sys. v. Roche*, 2020 WL 7023896, at \*18–19 (Del. Ch. Nov. 30, 2020); *In re Baker Hughes Inc. Merger Litig.*, 2020 WL 6281427, at \*16 (Del. Ch. Oct. 27, 2020); *In re Hansen Med., Inc. S'holders Litig.*, 2018 WL 3025525, at \*11 (Del. Ch. June 18, 2018).

support a claim for breach of fiduciary duty against Petigrow that could support a quasi-appraisal remedy.

When valuing the Company for purposes of the quasi-appraisal remedy, the court must incorporate the value of derivative claims. As Chancellor Allen explained, "If the company has substantial and valuable derivative claims, they, like any asset of the company, may be valued in an appraisal."[13] The same is true when valuing a corporation in connection with a claim for breach of fiduciary duty.[14] Consequently, as part of the claim

---

[13] *Porter v. Tex. Com. Bancshares, Inc.*, 1989 WL 120358, at *5 (Del. Ch. Oct. 12, 1989) (Allen, C.); *accord In re Cox Radio, Inc. S'holders Litig.*, 2010 WL 1806616, at *14 (Del. Ch. May 6, 2010) ("Under Delaware law, breach of fiduciary duty claims that do not arise from the merger are corporate assets that may be included in the determination of fair value in an appraisal proceeding. Thus, even though the Appraisal Objectors' claims related to the propriety of the Transaction are released by the Settlement, any fiduciary duty claim they may have that is not related to the Transaction, including their claim challenging the stock repurchase program, is not subject to the Settlement's release and, thus, can be valued at appraisal." (cleaned up)), *aff'd*, 9 A.3d 475 (Del. 2010) (TABLE); *Bomarko, Inc. v. Int'l Telecharge, Inc.*, 1994 WL 198726, at *3 (Del. Ch. May 16, 1994) (rejecting argument that litigation of derivative "claims would be an impermissible expansion of the statutory appraisal remedy" and holding that "breach of fiduciary claims that do not arise from the merger are corporate assets that may be included in the determination of fair value"); *In re Radiology Assocs., Inc. Litig.*, 1990 WL 67839, at *13 (Del. Ch. May 16, 1990) ("[C]laims . . . that are derivative in nature and precluded for lack of standing, may be considered in the appraisal phase of this litigation.").

[14] *See Morris v. Spectra Energy P'rs (DE) GP, LP*, 246 A.3d 121, 136–38 (Del. 2021) (reversing trial court's dismissal of claim for breach of fiduciary duty based on merger price failure to include value for viable derivative claim); *In re Happy Child World, Inc.*, 2020 WL 5793156, at *10–22 (Del. Ch. Sept. 29, 2020) (adjudicating derivative claims in plenary action for appraisal and breach of fiduciary duty and including net value of derivative claims in appraisal award); *Zutrau v. Jansing*, 2014 WL 3772859, at *2 (Del. Ch. July 31, 2014) ("[T]he monetary value of the meritorious derivative claims that the company had against the defendant at the time of the reverse stock split should be treated as a non-operating corporate asset and added to the value of the company."), *aff'd*, 123 A.3d 938 (Del. 2015) (TABLE); *Oliver v. Bos. Univ.*, 2006 WL 1064169, at *19–21 (Del.

for quasi-appraisal, the parties will conduct discovery into and the court will need to value the derivative claims that the plaintiffs have asserted based on the use of Company resources in connection with the Share Withdrawal.

The fact that the court will have to value the derivative claims related to the use of expenses for the Share Withdrawal does not mean that the direct challenge to the Outbound Merger arises out of the facts surrounding the Share Withdrawal. The direct challenge to the Outbound Merger principally concerns what took place in 2019, when Mary Ellen and the Advisors caused the Outbound Merger to take place. The Share Withdrawal took place a year earlier and was a separate transaction.

The plaintiffs argue that in *SPay*, this court grounded its exercise of personal jurisdiction on a forum selection clause in an asset purchase agreement, then exercised ancillary jurisdiction over a defendant for counts asserting breach of an employment agreement, breach of fiduciary duty, unjust enrichment, and conversion. The court remarked that all of the claims arose from a single nexus of fact—the concealment of the

Ch. Apr. 14, 2006) (including value of potential derivative claims in entire fairness award); *Nagy*, 770 A.2d at 55 n.23 ("To the extent that the entity possessed valuable legal claims, the value of those claims is part of the overall value of the entity . . . ."); *Merritt v. Colonial Foods, Inc.*, 505 A.2d 757, 765–66 (Del. Ch. 1986) (Allen, C.) (holding defendants failed to prove "that the merger price was fair considering the value of the then pending derivative claims to the corporation" and that "[i]n the relief phase of this class-action litigation, plaintiffs will be free to introduce evidence relating to . . . the value . . . of the claims previously asserted in the derivative litigation"); *id.* at 763 n.3 (extinguishment of derivative claim in merger transaction does not "permit self-dealing fiduciaries inappropriately to avoid their duty to account to minority shareholders" in subsequent entire fairness action).

seller's true business relationship with another firm. *SPay*, 2021 WL 6053869, at *5. The plaintiffs argue that in this case, all of their claims relate to the concealment of the self-dealing and other wrongdoing in which Mary Ellen and the Advisors engaged. But the parallels are too strained. The common nucleus of fact in *SPay* was the sale of a business, and the court asserted jurisdiction over the defendants for purposes of all claims that arose out of that nucleus of fact. The concealment of the business relationship was a temporally narrow and specific issue. In this case, the plaintiffs describe a scheme that began in 2015 and extended into 2020. The Share Withdrawal took place in December 2018 and was factually unrelated to the Outbound Merger. Jurisdiction over Petigrow for purposes of the Outbound Merger is not sufficient to provide jurisdiction for purposes of the Share Withdrawal.

**B.     Service Of Process Under The Long-Arm Statute**

The plaintiffs also seek to serve Petigrow under Delaware's Long-Arm Statute. It provides:

> (c) As to a cause of action brought by any person arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any nonresident, or a personal representative, who in person or through an agent: (1) Transacts any business or performs any character of work or service in the State . . . .

10 *Del. C.* § 3104(c)(1). A person who has engaged in such an act has established a "legal presence within the State" and "thereby submits to the jurisdiction of the Delaware courts." *Id.* § 3104(b).

Section 3104 is a "single act" statute. *Eudaily v. Harmon*, 420 A.2d 1175, 1180 (Del. 1980). Therefore, a "single transaction is sufficient to [authorize service and] confer

34

jurisdiction where the claim is based on that transaction." *Crescent/Mach I P'rs, L.P. v.*

*Turner*, 846 A.2d 963, 978 (Del. Ch. 2000) (cleaned up). The defendant need not take the

act personally; the Long-Arm Statute recognizes that the forum-directed activity can be

accomplished "through an agent." 10 *Del. C.* § 3104(c).

Section 3104(c) is to be "broadly construed to confer jurisdiction to the maximum

extent possible under the Due Process Clause." *Hercules Inc. v. Leu Tr. & Banking*

*(Bahamas) Ltd.*, 611 A.2d 476, 480 (Del. 1992); *accord LaNuova D & B, S.p.A., v. Bowe*

*Co., Inc.*, 513 A.2d 764, 768 (Del. 1986).

> [T]rial courts must give a broad reading to the terms of the long-arm statute[]
> in order to effectuate the statute's intent to ensure that this state's court may
> exercise jurisdiction to the full limits permissible under the Due Process
> Clause. In other words, the Supreme Court has instructed that trial courts
> should permit service under § 3104 if the statutory language plausibly
> permits service, and rely upon a Due Process analysis to screen out uses of
> the statute that sweep too broadly.

*Sample II*, 935 A.2d at 1056 (footnotes omitted). That said, there must be a sufficient nexus

between the jurisdictional act and the claims that the party is asserting. *LaNuova*, 513 A.2d

at 768 (explaining that the transaction of business only supports jurisdiction "with respect

to claims which have a nexus to the designated conduct.").

The starting point for analysis under the Long-Arm Statute is the identification of a

Delaware-directed act that can supply the necessary nexus with this state. A long line of

decisions holds that the act of forming a Delaware entity constitutes the transaction of

business within this state for purposes of the Long-Arm Statute and will support personal

jurisdiction for claims that are sufficiently related to the formation of the entity.[15] Negotiating and consummating a merger involving a Delaware corporation constitutes the transaction of business within this state. *See Kahn v. Lynch Commc'n Sys., Inc.*, 1989 WL 99800, at *4 (Del. Ch. Aug. 24, 1989).

No Delaware decision has addressed whether moving the situs of a trust to Delaware is sufficiently analogous to the formation of a Delaware entity to support service under the Delaware Long-Arm Statute. Although moving a trust to Delaware does not require a filing with the Delaware Secretary of State, that does not undermine the significance of the act. The situs of a trust generally moves with its place of administration. When a new trustee assumes its administrative duties, the situs of the trust changes to the place of administration, and the law of that jurisdiction governs the administration of the trust. *In re Peierls Fam. Inter Vivos Trs.*, 77 A.3d 249, 265 (Del. 2013) (holding that upon the

---

[15] *Terramar Retail Ctrs., LLC v. Marion #2-Seaport Tr. U/A/D/ June 21, 2002*, 2017 WL 3575712, at *5 (Del. Ch. Aug. 18, 2017) ("Forming a Delaware entity both requires a filing in Delaware with the Secretary of State and necessarily has an effect within Delaware. Not surprisingly, Delaware courts have held consistently that forming a Delaware entity constitutes the transaction of business within Delaware that is sufficient to establish specific personal jurisdiction under Section 3104(c)(1)."), *aff'd*, 184 A.3d 1290 (Del. 2018); *see, e.g.*, *BrandRep, LLC v. Ruskey*, 2019 WL 117768, at *2 (Del. Ch. Jan. 7, 2019) (concluding that the formation of a Delaware LLC was a sufficient act to support service of process and exercise of personal jurisdiction in Delaware over a factually related claim for misappropriating trade secrets and unfair competition); *In re Mobilactive Media, LLC*, 2013 WL 297950, at *28 (Del. Ch. Jan. 25, 2013) (finding § 3104(c)(1) satisfied where defendant incorporated Delaware entities for the purpose of accomplishing one of the challenged acts); *EBG Hldgs. LLC v. Vredezicht's Gravenhage 109 B.V.*, 2008 WL 4057745, at *6 (Del. Ch. Sept. 2, 2008) ("[T]he incorporation and operation of a Delaware subsidiary constitutes the transaction of business in Delaware under § 3104(c)(1).").

appointment of a Texas-domiciled trustee, a trust established in New York, administered by New York trustee, and which selected New York law to govern its administration became a trust sitused in Texas with its administration governed by Texas law). Section 3332(b) of Title 12 of the Delaware Code codifies this rule by stating that "[e]xcept as otherwise provided by the terms of a court order and notwithstanding a general choice of law provision in the governing instrument of a trust, . . . the laws of this State shall govern the administration of a trust while the trust is administered in this State . . . ." 12 *Del. C.* § 3332(b).

By definition, a trustee administering a trust in Delaware is located within this state. Moving a foreign trust to Delaware requires the appointment of the Delaware trustee. The Delaware trustee becomes a party to the trust agreement and takes charge of the trust assets. By appointing a Delaware trustee and moving the situs of a trust to Delaware, the parties taking those actions engage in Delaware-directed activity, purposefully avail themselves of Delaware's laws, and engage in business within this state.

In this case, the appointment of First Republic Delaware as the trustee of Mary Ellen's GRAT caused the situs of the GRAT to move to Delaware and caused Delaware law to govern its administration. To effectuate the appointment of the new trustee and associated change of situs, the parties executed an amendment to the trust instrument governing Mary Ellen's GRAT. The amendment specifically stated that "the situs of the Trust shall be Delaware" and "the governing law of the Trust shall henceforth be the law of the State of Delaware." Ex. 16 at '945.

37

The next question is whether the appointment of First Republic Delaware can be attributed to Petigrow. This court has rejected the contention that a lawyer can hide behind its client and disclaim responsibility for its role in a Delaware-directed act. *Sample II*, 935 A.2d at 1047–48. The lawyers in *Sample II* had arranged for a corporation's registered agent in Delaware to file a certificate of amendment with the Delaware Secretary of State. The lawyers argued that the filing should be viewed as the act of their client and could not be attributed to them, either because doing so would disregard the separate existence of the corporation, or because they only acted as lawyers performing services for a fee. *Id.* at 1058–60. Writing as a member of this court, Chief Justice Strine rejected these arguments and held that "the use of § 3104 to serve the moving defendants is entirely consistent with the language and evident purpose of that statute, and with the precedent interpreting it. The requirement that there be a statutory basis for service is therefore met." *Id.* at 1062.

In this case, the Complaint pleads facts sufficient to support an inference that Petigrow played a leading role in the process of appointing First Republic Delaware as trustee, moving Mary Ellen's GRAT to Delaware, and amending the trust instrument. The Complaint specifically pleads that Petigrow "drafted or facilitated the execution of the documents effecting Mary Ellen's purchase of 25% of the Company out of a trust in December 2018" and that "Petigrow coordinated the legal documentation with First Republic from Harris FRC email accounts and on Harris FRC letterhead." Compl. ¶¶ 23, 104. Petigrow secured the lowball valuation for the Share Withdrawal. *Id.* ¶ 96. He also coordinated with First Republic Delaware over using the valuation as the price of the Share Withdrawal. *Id.* ¶ 99.

38

Petigrow's significant role is not surprising, as Petigrow was Mary Ellen's personal lawyer and the chief legal mind working on Mary Ellen's behalf. He also either drafted or oversaw the preparation of every legal document pertinent to the case, including:

- the 2015 amendment to Dr. Harris's GRAT and the codicil to his will;

- the corporate documents that Mary Ellen used to take control over the Company, including Dr. Harris' resignation letter from the Board, a power of attorney, and two proxies;

- Lolli's employment agreement with the Company;

- Grinnell's consulting agreement with the Company;

- his own employment agreement with the Company;

- the physician certificate used to declare Dr. Harris incompetent;

- Royce's governing documents;

- the management services agreement with Royce and both of the amendments;

- minutes of Board and stockholder meetings;

- the documents for the Inbound Merger; and

- the documents for the Outbound Merger.

*See id.* ¶¶ 23, 33–35, 41, 61, 69–73, 80, 123–24, 128, 130, 140. He also formed entities for Mary Ellen's personal use at the Company's expense. *See id.* ¶¶ 29, 56–58, 68. When the defendants moved the Company to Delaware through the Inbound Merger, Petigrow and Mary Ellen created the Delaware entity and secured an office for the Company in Newark. *Id.* ¶¶ 72, 85. Petigrow ran the 2019 annual meeting at which he could not or would not answer a series of questions. *Id.* ¶ 119. He worked extensively on the Outbound Merger. *Id.* ¶¶ 123–24, 128, 130.

39

The Complaint alleges that "[o]n December 24, 2018, the Advisors caused the removal of Premier Trust as the Mary Ellen GRAT trustee and installed First Republic." *Id.* ¶ 105. Petigrow is one of the Advisors. Given his role and activities, it is reasonable to infer that he was directly involved in appointing First Republic Delaware as trustee and moving the situs of the GRAT to Delaware.

The final question is whether the appointing of First Republic Delaware is sufficiently connected to the Share Withdrawal to subject Petigrow to suit in this court for claims relating to that transaction. "When determining whether a sufficient nexus exists, the principal factor that Delaware courts have examined is the extent of the factual relationship between the [Delaware-directed act] and the cause of action." *Terramar*, 2017 WL 3575712, at *6. A sufficient nexus will exist if the formation of the entity was "an integral component of the total transaction."[16] Satisfying the "integral component" test is sufficient but not necessary. The "integral component" language comes from *Papendick v. Bosch GmbH*, where the Delaware Supreme Court examined whether the formation of a Delaware entity created sufficient minimum contacts to support personal jurisdiction in Delaware over the party forming it. 410 A.2d 148, 152 (Del. 1979). Issued just two years

---

[16] *Lone Pine Res., LP v. Dickey*, 2021 WL 2311954, at *5 (Del. Ch. June 7, 2021) (cleaned up); *accord, e.g.*, *Dow Chem. Co. v. Organik Kimya Hldg. A.S.*, 2017 WL 4711931, at *8 (Del. Ch. Oct. 19, 2017) ("[T]he formation must be an integral component of the total transaction to which plaintiff's cause of action relates." (cleaned up)); *Siniscalchi*, 2014 WL 6589342, at *10 ("When done as an integral part of a wrongful scheme, the formation of a Delaware entity confers personal jurisdiction under the long-arm statute.").

after *Shaffer v. Heitner*, 433 U.S. 186 (1977), the defendants argued that the formation of the subsidiary was indistinguishable from merely owning shares in a Delaware entity, which the Supreme Court of the United States held in *Shaffer* did not provide sufficient minimum contacts to support personal jurisdiction. Turning to the facts of the case, the Delaware Supreme Court distinguished *Shaffer* and held that the formation of the Delaware entity created sufficient minimum contacts with Delaware:

> Here, unlike *Shaffer*, there were significant contacts between RB, the State of Delaware, and the litigation. RB came into the State of Delaware to create, under the Delaware Corporation Law, a subsidiary corporation for the purpose of implementing its contract with B-W and accomplishing its acquisition of B-W stock. RB utilized the benefits and advantages of Delaware's Corporation Law for the creation of RBNA to be the vehicle for channeling to B-W the purchase money for the B-W stock and for becoming the recipient of the B-W stock. It is reasonable to assume that RB saw benefits and advantages in purposefully selecting the State of Delaware and utilizing its laws, above all others, for the creation of RBNA in the execution of its agreement with B-W. We conclude that RB's ownership of RBNA stock was the result of RB's purposeful activity in Delaware as an integral component of its total transaction with B-W to which the plaintiff's instant cause of action relates.

*Papendick*, 410 A.2d at 152. The *Papendick* court thus held that what occurred in that case—"RB's purposeful activity in Delaware as an integral component of its total transaction with B-W to which the plaintiff's instant cause of action relates"—constituted a sufficiently significant contact to support jurisdiction. The *Papendick* court did not hold that meeting "an integral component" test was required to establish jurisdiction. To the contrary, the court noted that "[b]oth pre- and post-*Shaffer* decisions have sustained jurisdiction in cases in which the contacts with the forum were less than those present here

41

. . . ." *Id.* at 153. The "integral component" phrase was part of the application of the governing standard; it was not itself the governing standard.

Showing that a Delaware-directed act was an integral part of the challenged transaction is thus one way of establishing a sufficient nexus, but not the only way.[17] A sufficient nexus also will exist if the formation of the entity is part of a larger wrongful scheme. *See Pinkas*, 2011 WL 5222796, at *2. And a sufficient nexus will exist if the Delaware-directed act "set in motion a series of events which form the basis for the cause of action before the court." *EBG Hldgs.*, 2008 WL 4057745, at *6 (cleaned up). Those possibilities are illustrative, not exclusive.

For purposes of the Share Withdrawal, the domestication of Mary Ellen's GRAT had a sufficient connection to the Share Withdrawal, even under the integral-component standard. The key to completing the Share Withdrawal was appointing a trustee who would not contest the lowball appraisal that Mary Ellen and the Advisors had secured. Only Selcow, the wealth manager at First Republic Delaware, was sufficiently beholden to Mary

---

[17] *E.g.*, *Newspan, Inc. v. Hearthstone Funding Corp.*, 1994 WL 198721, at *8 n.16 (Del. Ch. May 10, 1994) ("It is well-accepted that the incorporation of a company in Delaware in furtherance of a fraudulent scheme constitutes a contact with this jurisdiction sufficient to satisfy the requirements of the Due Process Clause, *particularly where the creation of the corporation is an integral part of the actions giving rise to suit*." (emphasis added)); Donald J. Wolfe, Jr. & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery* § 3.04[c][3] (2d ed. 2018 & Supp.) ("[I]n suits in which the incorporation of a Delaware subsidiary is an integral component of the conduct giving rise to the cause of action, the Delaware courts have consistently recognized that a nonresident defendant's incorporation of such subsidiary constitutes constitutionally sufficient 'minimum contacts' with Delaware.").

Ellen and the Advisors and sufficiently interested in having a new pool of assets to manage to sign off on the Share Withdrawal. That meant First Republic Delaware had to become the trustee.

The Share Withdrawal needed to be completed by December 31, 2018, otherwise 245 shares representing just under 25% of the Company's common stock would be distributed to the Siblings. Mary Ellen and the Advisors not only needed a cooperative trustee who would not challenge the Share Withdrawal, but also a trustee who would allow the transaction to close quickly, before the year-end deadline. Again, only First Republic Delaware fit the bill.

The appointment of First Republic Delaware and the resulting domestication of the GRAT as a Delaware-sitused trust is a Delaware-directed act that is sufficient to support service of process under the Long-Arm Statute for purposes of claims relating to the Share Withdrawal. Count V asserts a claim for tortious interference with the GRAT's trust instrument based on the Share Withdrawal. Petigrow can be served under the Long-Arm Statute for purposes of that claim.

## C.   Due Process

The second step in the analysis of personal jurisdiction is to determine whether its exercise would violate concepts of due process. "The well-established point of departure is that certain minimum contacts must exist between a State and a nonresident defendant before that State can exercise personal jurisdiction over him." *Moore v. Little Giant Indus., Inc.*, 513 F. Supp. 1043, 1048 (D. Del. 1981) (internal quotation marks omitted), *aff'd*, 681 F.2d 807 (3d Cir. 1982). The question is whether the defendants had sufficient minimum

43

contacts with Delaware such that "compelling [them] to defend [themselves] in the State would be consistent with the traditional notions of fair play and substantial justice[.]" *Waters v. Deutz Corp.*, 479 A.2d 273, 276 (Del. 1984) (internal quotation marks omitted).

As the Delaware Supreme Court explained in *Papendick*, a party that forms a Delaware corporation has purposely availed itself of Delaware's laws and established sufficient minimum contacts with the state to satisfy due process. 410 A.2d at 152. It is reasonable to assume that Petigrow saw advantages in using Delaware law to govern Mary Ellen's GRAT and therefore chose to use Delaware as the jurisdiction whose laws would govern the Share Withdrawal. *See id.* It was necessarily foreseeable that Petigrow could be subjected to suit in Delaware based on his involvement in a transaction that invoked the benefits and protections of Delaware's laws and had a significant effect within the state.

Exercising personal jurisdiction over Petigrow for purposes of Count V is therefore consistent with due process. Petigrow's motion to dismiss Count V for lack of personal jurisdiction is denied.

## III.    THE RULE 12(B)(6) MOTION

Petigrow separately contends under Rule 12(b)(6) that Counts IV and V of the Complaint do not state a claim against him. When reviewing a motion to dismiss under Rule 12(b)(6), Delaware courts "(1) accept all well pleaded factual allegations as true, (2) accept even vague allegations as 'well pleaded' if they give the opposing party notice of the claim, [and] (3) draw all reasonable inferences in favor of the non-moving party." *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 535 (Del. 2011). "[T]he governing pleading standard in Delaware to survive a motion to dismiss is

44

reasonable conceivability." *Id.* at 537 (cleaned up). "The reasonable conceivability standard asks whether there is a possibility of recovery." *Garfield v. BlackRock Mortg. Ventures, LLC*, 2019 WL 7168004, at *7 (Del. Ch. Dec. 20, 2019).

"[T]he threshold for the showing a plaintiff must make to survive a motion to dismiss is low." *Doe v. Cahill*, 884 A.2d 451, 458 (Del. 2005). "A court can dismiss for failure to state a claim on which relief can be granted only if it appears with reasonable certainty that the plaintiff could not prove any set of facts that would entitle him to relief." *Id.* (cleaned up). That is, "[o]nly if a court can say that the plaintiff could prevail on no state of facts inferable from the pleadings may it dismiss the complaint under Rule 12(b)(6)." *Ramunno v. Cawley*, 705 A.2d 1029, 1034 (Del. 1998). Nevertheless, Delaware courts "do not . . . simply accept conclusory allegations unsupported by specific facts, nor do [they] draw unreasonable inferences in the plaintiff's favor." *Clinton v. Enter. Rent-A-Car Co.*, 977 A.2d 892, 895 (Del. 2009).

## A.     Count IV: Aiding and Abetting A Breach Of Duty

In Count IV, the plaintiffs allege that Petigrow aided and abetted breaches of fiduciary duty by the other defendants, including in connection with the Share Withdrawal. In asserting this claim derivatively, the plaintiffs alleged that Mary Ellen breached her fiduciary duty of loyalty by causing the Company to incur expenses in connection with the Share Withdrawal, including by paying for the EisnerAmper valuation and for the work that Petigrow, Lolli, Grinnell, and Company Forwarding Counsel performed. The plaintiffs alleged that those expenses did not benefit the Company and instead benefitted Mary Ellen. And the plaintiffs alleged that Petigrow knowingly participated in Mary Ellen's breaches

45

of duty by securing the EisnerAmper valuation and accepting payment from the Company for his services.

Although that theory states a claim on which relief can be granted, it is a derivative claim. The court held in the Standing Decision that the Outbound Merger deprived the plaintiffs of standing to pursue their derivative claims as derivative claims. The court dismissed the derivative claims on that basis, while noting that the plaintiffs could still litigate about those claims as part of their challenge to the fairness of the Outbound Merger and as assets to be valued for purposes of a quasi-appraisal remedy or in an appraisal proceeding. The Standing Decision rendered moot Petigrow's motion to dismiss Count IV as to Count IV, and the motion is denied on that basis.

## B. Count V: Tortious Interference

In Count V, the plaintiffs allege that Petigrow tortiously interfered with the trust instrument by helping to orchestrate the Share Withdrawal. That count states a claim on which relief can be granted.

Delaware has adopted the formulation of a claim for tortious interference with contract that appears in the Restatement (Second) of Torts. *WaveDivision Hldgs., LLC v. Highland Cap. Mgmt., L.P.*, 49 A.3d 1168, 1174 (Del. 2012); *ASDI, Inc. v. Beard Rsch., Inc.*, 11 A.3d 749, 751 (Del. 2010). Generally speaking, "[o]ne who intentionally and improperly interferes with the performance of a contract . . . between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other . . . ." Restatement (Second) of Torts § 766 (Am. L. Inst. 1979), Westlaw (database updated Oct. 2022) [hereinafter Restatement of Torts]. Reframed

46

as elements, a plaintiff must plead "(1) a contract, (2) about which defendant knew, *and* (3) an intentional act that is a significant factor in causing the breach of such contract, (4) without justification, (5) which causes injury." *Bhole, Inc. v. Shore Invs., Inc.*, 67 A.3d 444, 453 (Del. 2013) (internal quotation marks omitted).

In this case, the contract was the trust instrument, and Petigrow plainly knew about it. The Complaint pleads facts supporting a breach of contract, which requires "(i) a contractual obligation, (ii) a breach of that obligation by the defendant, and (iii) a causally related injury that warrants a remedy, such as damages or in an appropriate case, specific performance." *AB Stable VIII LLC v. Maps Hotels & Resorts One LLC*, 2020 WL 7024929, at *47 (Del. Ch. Nov. 30, 2020), *aff'd*, 268 A.3d 198 (Del. 2021).

The trust instrument imposed an obligation on Mary Ellen to pay equivalent value for any trust asset. The operative language stated: "The Grantor . . . may acquire or reacquire any portion of the trust fund of any trust by substituting therefore other property of an equivalent value . . . . Notwithstanding any other provision of this Trust Agreement, the Grantor may exercise this power without the consent of the Trustees." Dkt. 438 Ex. A § 6.08 (the "Asset Withdrawal Provision"). The Complaint pleads that Mary Ellen failed to pay equivalent value for the shares in the trust, instead paying approximately two-thirds of their value. Compl. ¶¶ 93–111. Those allegations plead a claim for breach of the Asset Withdrawal Provision.

Petigrow responds that the Asset Withdrawal Provision creates an obligation for the trustee—not Mary Ellen—to ensure equivalent value before transferring trust property. The plain language of the Asset Withdrawal Provision requires that Mary Ellen pay

47

equivalent value. It expressly states that she may exercise that power *without* the consent of the trustee. As a trustee, First Republic Delaware may well have had an obligation to protect the trust by ensuring that Mary Ellen paid equivalent value and suing her if she did not, but that fiduciary obligation does not eliminate Mary Ellen's contractual duty. Whether First Republic Delaware also breached an obligation is a separate issue.

A claim for tortious interference requires that the plaintiff plead facts supporting an inference that the defendant took an intentional act that was a significant factor in causing the breach of contract. The Complaint pleads that Petigrow (i) obtained the lowball EisnerAmper valuation that enabled Mary Ellen to underpay for the shares, (ii) participated in securing First Republic Delaware as the trustee of the trust, (iii) oversaw the drafting of the legal documentation for the Share Withdrawal, and (iv) pushed to complete the Share Withdrawal quickly. It is reasonable to infer that Petigrow knowingly acted with the intent of enabling Mary Ellen to provide less than equivalent value in the Share Withdrawal.

The final element is the existence of justification. "The tort of interference with contractual relations is intended to protect a promisee's economic interest in the performance of a contract by making actionable 'improper' intentional interference with the promisor's performance." *Shearin v. E.F. Hutton Gp.*, 652 A.2d 578, 589 (Del. Ch. 1994). "The adjective 'improper' is critical. For participants in a competitive capitalist economy, some types of intentional interference with contractual relations are a legitimate part of doing business." *NAMA Hldgs., LLC v. Related WMC LLC*, 2014 WL 6436647, at *26 (Del. Ch. Nov. 17, 2014). "[C]laims for unfair competition and tortious interference must necessarily be balanced against a party's legitimate right to compete." *Agilent Techs.,*

48

*Inc. v. Kirkland*, 2009 WL 119865, at \*8 (Del. Ch. Jan. 20, 2009). Determining when intentional interference becomes improper requires a "complex normative judgment relating to justification" based on the facts of the case and "an evaluation of many factors." *Shearin*, 652 A.2d at 589 (internal quotation marks omitted).

The Delaware Supreme Court has adopted the factors identified in Section 767 of the Restatement of Torts as considerations to weigh when evaluating the existence of justification. *WaveDivision*, 49 A.3d at 1174. The factors are:

> (a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the interference and (g) the relations between the parties.

*Id.* (formatting added). Weighing the seven factors identified in the Restatement of Torts requires the court to engage in a fact-specific inquiry to determine whether the interference with contract is improper under the particular circumstances of the case. *See* Restatement of Torts, *supra*, § 767 cmt. b ("[T]his branch of tort law has not developed a crystallized set of definite rules as to the existence or non-existence of a privilege . . . . Since the determination of whether an interference is improper is under the particular circumstances, it is an evaluation of these factors for the precise facts of the case before the court.").

It is reasonable to infer that Petigrow did not act with justification. The facts of this case do not involve a party engaged in competition, nor do they involve allegations of efficient breach. The Complaint depicts an underhanded effort to extract an approximately 25% block of Company stock from Mary Ellen's GRAT at a lowball price, thereby

49

benefitting herself by expropriating value from the other stockholders and ensuring that the block would not fall into adverse hands.

Count V pleads all of the elements for tortious interference. Petigrow responds by mischaracterizing the claim, recasting it as a claim for tortious interference with an inheritance or as a collateral attack on the validity of a will. When a party has to pretend that a claim says something quite different, that is a good sign that the party has no answer to the claim. Count V states a claim for tortious interference with contract against Petigrow.

## IV. CONCLUSION

Petigrow is subject to personal jurisdiction in this court for purposes of Count V, which states a claim against him. His motion to dismiss Count IV is moot.